1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  MARCOS CAVALIER, | Civil No. 14cv1691-WQH (DHB) |
| 12              Plaintiff, | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE REGARDING MOTION TO DISMISS CIVIL RIGHTS COMPLAINT** |
| 13  v. | |
| 14  COUNTY OF SAN DIEGO; et al., | |
| 15              Defendants. | **[ECF No. 18]** |

16

17        Marcos Cavalier ("Plaintiff"), formerly incarcerated at the San Diego Central

18  Jail and the George Bailey Detention Facility ("GBDF"), is proceeding *pro se* in this

19  civil rights action filed pursuant to the Civil Rights Act, 42 U.S.C. § 1983.  Eleven of

20  the thirteen named Defendants[1] have filed a Motion to Dismiss Plaintiff's Complaint

21  _____

22  [1]      Plaintiff's Complaint names the following Defendants: County of San Diego;
23  Sheriff William Gore; Lt. Sheriff Montgomery; and Deputy Sheriffs Babcock, Edge,
    Gonzalez, Kamoss, Lusardi, Martinez, J. Navarro, Sobaszek, Spalsbury, and
24  Talamantez.  (ECF No. 1 at 2-3.)  Plaintiff sues each Defendant in their official
25  capacity, although he also sues Defendant Kamoss in his individual capacity.  (*Id.* at
    2.)  To date, Plaintiff has not served Defendants City of San Diego or Sheriff Gore.
26  As discussed below, the Court recommends that Plaintiff be ordered to show cause
27  why Defendants County of San Diego and Sheriff Gore should not be dismissed under
    Federal Rule of Civil Procedure 4(m) for failure to prosecute.  *See infra* Part IV.E.
28

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (ECF No. 18.)  In accordance with Civil Local Rule 72.1(d), Defendants' Motion to Dismiss is referred to the Honorable David H. Bartick for a Report and Recommendation.

After a thorough review of the pleadings, the parties' papers, and all supporting documents, the Court hereby **RECOMMENDS** that Defendants' Motion to Dismiss be **GRANTED** with leave to amend.

## I.  PLAINTIFF'S ALLEGATIONS

Plaintiff is a former inmate at multiple detention facilities operated by the San Diego County Sheriff's Department.[2]  In the Complaint, Plaintiff asserts civil rights claims against Defendants based on events allegedly occurring while Plaintiff was incarcerated at the San Diego Central Jail.  (ECF No. 1 at 1.)  Plaintiff asserts the following claims[3] against Defendants: unreasonable search and seizure, cruel and unusual punishment/excessive force, invasion of privacy, violation of Plaintiff's procedural due process rights, failure to provide medical care, illegal touching in violation of California Penal Code § 4030, battery, intentional and negligent infliction

---

[2]   Plaintiff's Complaint is based on events allegedly occurring while Plaintiff was housed at the San Diego Central Jail.  (*See* ECF No. 1 at 1.)  At the time Plaintiff initiated this action he was incarcerated at GBDF.  (*See id.*)  However, on August 13, 2014, Plaintiff notified the Court that he would be released from custody on August 24, 2014, and he provided the Court with his new mailing address.  (ECF No. 3.)  As part of their Motion to Dismiss, Defendants request that the Court take judicial notice of a certified copy of an In Custody Letter indicating that Plaintiff's incarceration terminated on August 24, 2014.  (ECF No. 18-1 at 2:3-8; ECF No. 18-2 at 4.)  As this matter is not subject to reasonable dispute, the Court grants Defendants' request and takes judicial notice of the fact that Plaintiff was released from custody on August 24, 2014.  *See* FED. R. EVID. 201.

[3]   Plaintiff identifies ten "causes of action" in his Complaint that are generally organized based around specific sets of factual allegations.  (*See* ECF No. 1 at 4-15.)  However, the majority of these "causes of action" contain multiple distinct legal claims.

of emotional distress, failure to train, and municipal liability pursuant to *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978).  (*See generally id.* at 4-14.) Plaintiff's claims are based on the following factual allegations:

**A.   February 2012 "Escape Risk" Classification**

Plaintiff was identified as an escape risk in February 2012 for allegedly trying to bail out in another inmate's name.  However, Plaintiff claims he has no knowledge of this incident, he was never questioned about an escape at any time, and he was never provided any documents regarding this incident.  Rather, Plaintiff was simply provided a green jump suit[4] one day without being given an opportunity to defend against the charge because there was no formal charge.  Nevertheless, Plaintiff continues to be punished.  Plaintiff alleges a violation of his due process rights because his classification as an escape risk prevents him from going to a camp and gaining additional work time/good time credits.  (*Id.* at 11-12.)

**B.   February 1, 2013 Placement in Administrative Segregation**

Plaintiff was placed in Administrative Segregation on February 1, 2013 for possession of razors.  Subsequently, it was determined that they were not Plaintiff's razors.  Nevertheless, Plaintiff remained in solitary confinement for seventeen months causing a "direct effect on [his] psych [sic]."  (*Id.* at 11.)

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4]   Although the parties' arguments are silent on the matter, the context of Plaintiff's allegations suggests that an inmate classified as an escape risk is required to wear a green jump suit as a means of distinguishing between non-risk inmates.

3

**C.     May 31, 2014 Pat Down and Strip Search[5]**

On May 31, 2014, Plaintiff was subjected to a routine weekly pat down that was "captured on film."  He was placed in handcuffs and removed from his cell.  The supervising officer, Defendant Kamoss, allowed a new, unnamed cadet to conduct the pat down, which may have been the cadet's first pat down.  During the pat down, the cadet discovered Plaintiff had an extra pair of socks in front of his underwear.  The cadet was standing directly behind Plaintiff and pulling Plaintiff's testicles and the socks towards his rear while claiming to Defendant Kamoss, "It's in his butt."  Plaintiff informed the officers it was only a pair of socks and that he could remove them himself.  An unknown officer proceeded to "open [Plaintiff's] underwear and take a peek inside."  Then, that officer or a different officer reached inside Plaintiff's pants and underwear to "dig around, feeling around on [Plaintiff's] privates."  The officer removed one sock before proceeding to reach back inside Plaintiff's underwear to "feel[] around to retrieve [the] other."  Each time the officer was "obviously stroking [Plaintiff's] penis."  Plaintiff pleaded with the officers to remove the handcuff from one of his hands to let him remove the socks himself.  Plaintiff alleges he should never have been placed in handcuffs because he has no history of violence with staff or inmates.  Plaintiff alleges the officers involved abused their authority when they touched and groped him.  Plaintiff alleges the supervising officer,

---

[5]     Plaintiff's Complaint differentiates between a routine weekly pat down and a subsequent strip search and, for purposes of summarizing Plaintiff's allegations the Court will do likewise.  However, in analyzing Plaintiff's claims, *see infra* Part IV.B, the Court is guided by Ninth Circuit precedent making clear that the alleged pat down should be construed as a strip search rather than a pat down.  Indeed, the Ninth Circuit has "defined pat-down searches as searches 'done briefly and while the inmates are fully clothed, and thus do not involve intimate contact with inmates' bodies.'" *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1142 (9th Cir. 2011) (en banc) (quoting *Grummet v. Rushen*, 779 F.2d 491, 496 (9th Cir. 1985)).  In contrast, where a prison official touches an inmate's penis and scrotum during a pat down, as alleged here, the search is more accurately characterized as a strip search.  *See id.*

4

Defendant Kamoss, failed to intervene when the officer reached inside Plaintiff's underwear, that Plaintiff "was not jerking away or being aggressive," and that the officer had absolutely no right to place his hands and feel around inside his underwear.  Plaintiff alleges the officers involved "condone[d] and even encourage[d] staff misconduct, all the while, useing [sic] [Plaintiff] as a 'training device' for new cadets." (*Id.* at 4, 13)

Following the pat down, Defendant Kamoss ordered Plaintiff to be strip searched.  Defendant Kamoss and nine other officers (Defendants Babcock, Edge, Gonzalez, Lusardi, Martinez, Navarro, Sobaszek, Spalsbury, and Talamantez) gathered in a private room.  Plaintiff alleges the number of officers present was unnecessary and unreasonable given that he was not combative and he did not have a history of violence to staff or other inmates.  Nevertheless, Defendant Kamoss said the number of officers was necessary "just in case."  Plaintiff requested permission to enter a private, curtained off portion of the room, but the request was denied.  Plaintiff was directed to face the wall and strip off all his clothing.  Feeling uncomfortable becoming naked in front of ten men, Plaintiff hesitated approximately ten seconds before complying and stripping off his clothes.  Plaintiff was forced to show his testicles and rectum cavity.  Plaintiff alleges that although the privacy curtains were located less than five feet from him, he was forced to strip in front of all the officers in a show of "brute force" meant to scare, intimidate, humiliate, and degrade Plaintiff.  Plaintiff further alleges the strip search was conducted as a means of training new cadets and that his body was used as a training "tool." (*Id.* at 5.)

After Plaintiff stripped off his clothes and showed ten officers his testicles and rectum cavity, Defendant Kamoss informed Plaintiff, "That's not good enough." Plaintiff was ordered to remove his clothing again, whereupon Plaintiff responded, "No."  Plaintiff refused because a strip search had already taken place during which Plaintiff had demonstrated he had no hidden clothing under his testicles or inside his rectum.  Thus, Defendant Kamoss' order requiring Plaintiff to remove his clothing a

5

second time was done only to degrade and humiliate Plaintiff and demonstrate complete power and control over Plaintiff.  Plaintiff peacefully protested by facing the wall rather than remove his clothing a second time.  Plaintiff was again placed in handcuffs willingly.  While facing the wall one of the officers grabbed Plaintiff's underwear and slid them off his buttocks.  Fearful of the officers' intentions, Plaintiff looked over his shoulder only to be yelled at to face the wall.  Plaintiff was then ordered to bend over and cough.[6]  Plaintiff refused to comply due to fear that the officer directly behind him planned to spread Plaintiff's buttocks.  Defendant Kamoss then instructed the officers to just check Plaintiff's clothing and the handcuffs were removed.  Plaintiff alleges this procedure was nothing more than a show of force and intimidation due to the fact that he had already submitted to a cavity search moments earlier.  Plaintiff alleges the officers abused their power, neglected his rights, and entirely disregarded his well-being.  Plaintiff was later told that he was not "forcefully" removed from his clothing; rather, he was "assisted."  He was also told the procedure was necessary to thoroughly check his underwear.  (*Id.* at 6.)

/ / /

---

[6]     The body of Plaintiff's Complaint does not identify which officer removed Plaintiff's clothing and ordered him to bend over and cough.  However, in the preliminary portion of the Complaint in which Plaintiff identifies the parties, he alleges Defendant Babcock (a) removed Plaintiff's clothing after Plaintiff had already submitted to a cavity inspection; (b) commanded Plaintiff to bend over and cough while fully restrained with hands cuffed behind his back; and (c) "may have been involved" in the assault on Plaintiff.  (ECF No. 1 at 2.)  Plaintiff also alleges in the preliminary portion of the Complaint that Defendant Edge (a) needlessly removed Plaintiff's clothing after Plaintiff had already stripped; (b) made contact with Plaintiff while he was completely naked; and (c) did nothing to stop the assault and may, in fact, have participated in the assault.  (*Id* at 3.)  Plaintiff also alleges Defendants Gonzalez, Lusardi, Martinez, Navarro, Sobaszek, Spalsbury, and Talamantez: (a) failed to intervene during the assault; (b) were needlessly present during the strip search for intimidation purposes; (c) violated Plaintiff's privacy rights; and (d) might also have participated in the assault and that the extent of their involvement will be determined later upon review of the video footage of the incident.  (*Id.*)

After Plaintiff was allowed to dress himself, he was placed in handcuffs willingly. While being escorted out of the room by an unknown deputy, Defendant Kamoss looked Plaintiff in the eyes and called Plaintiff a "queer." Plaintiff alleges this disrespectful comment is part of an overall level of disrespect of inmates by officers, as reflected by the number of inmate suicides at the San Diego Central Jail from May 2014 to June 2014. (*Id.*)

Later, the investigating officer, Defendant Montgomery, informed Plaintiff that Defendant Kamoss had not called Plaintiff a "queer." Rather, Defendant Kamoss had said the word in the form of a question, "Queer?" Plaintiff alleges this fact, as informed by Defendant Montgomery, was not included in the original incident report, and that it was not until after the investigation that Plaintiff noticed the report had been altered to include this information. (*Id.* at 7.)

Plaintiff alleges Defendant Kamoss' use of the derogatory term was intended to humiliate Plaintiff and make him feel ashamed after having shown ten officers his naked body. Plaintiff further alleges Defendant Montgomery further insulted Plaintiff by condoning the officers' behavior and stating that Defendant Kamoss had used the derogatory term in the form of a question and that Defendant Montgomery's actions demonstrate neglect for the physical and mental well-being of the inmate population. Finally, Plaintiff alleges Defendant Montgomery failed to conduct a fair and thorough investigation in that she (a) did not interview all involved parties, (b) told Plaintiff that officers are permitted to touch him, (c) intentionally covered up staff misconduct, and (d) ignored the accusations Plaintiff presented to her. (*Id.*)

The May 31, 2014 strip search was filmed, without warning and without Plaintiff's consent, and subsequently shown to at least three female officers (*i.e.*, Defendant Montgomery, Lt. Coyne, and Lt. Harvel).[7] Plaintiff alleges Defendant Montgomery copied the film and it could end up in the hands of an unknown number

---

[7] Neither Lt. Coyne nor Lt. Harvel are named as defendants in this case.

of officers who can then view Plaintiff's naked body. Plaintiff claims it violates his privacy rights to show the film depicting his strip search, which included showing Plaintiff's testicles and rectum cavity, to members of the opposite sex. Plaintiff argues "[t]his procedure should not be filmed period," and that it constitutes "prison porn" created to entertain prison staff. Plaintiff further argues a strip search should only be filmed "for the sole purpose to protect the inmate or staff from any harm," or in the most severe cases involving combative and aggressive inmates. Plaintiff claims he will forever be forced to worry about the exposure of the film and that this violation of his privacy has caused "anguish, grief, emotional distress, and a whole lot more." Plaintiff alleges no protocols exist to protect inmates' dignity. (*Id.* at 8-9.)

On May 31, 2014, at approximately 11:30 a.m., Plaintiff received a rule violation report ("RVR") from Defendant Sobaszek after which he was immediately placed on lockdown as punishment prior to any adjudication of guilt. Plaintiff was charged in the RVR with the following rule violations: disrespect to staff, disobeying staff instructions, boisterous activity, excess clothing, and delaying jail operations. (*Id.* at 10.)

On June 2, 2014, Defendant Navarro held a hearing. However, Defendant Navarro had been one of the officers present during the entire incident on May 31, 2014. As a result, Defendant Navarro had a biased opinion as to Plaintiff's guilt. Plaintiff informed Defendant Navarro that he would plead guilty only to the charge that he had extra clothing, and Defendant Navarro agreed to dismiss the remaining charges. However, upon receipt of a copy of the disposition, Plaintiff later learned Defendant Navarro lied and claimed that Plaintiff had pled guilty to disobeying staff instructions. Defendant Navarro also found Plaintiff guilty of disrespecting staff. Plaintiff also noticed that Defendant Navarro claimed he gave Plaintiff a three-day lockdown beginning on May 30, 2014, even though the incident did not occur until May 31, 2014.

/ / /

8

Plaintiff alleges the incident report was later revised to add six new sentences without his knowledge.  Plaintiff was not provided a copy of the revised incident report for approximately three weeks, and he was not afforded an opportunity to defend himself from the newly-added charges.  Plaintiff alleges Defendant Montgomery falsified the document, thus depriving him of his right to a fair investigation and his constitutional right to due process.  Plaintiff submitted a grievance after learning of the revised incident report but he has received no response as of the filing of the Complaint.  Plaintiff alleges the document revision was done in a direct attempt to cover up staff misconduct.  (*Id.* at 2, 10-11, 16.)

Plaintiff alleges Defendant Sheriff Gore failed to provide officers with adequate training pertaining to inmates' constitutional rights.  Specifically, Plaintiff alleges Sheriff Gore is on a "hiring blitz" to acquire new officers but he offers poor training leading to extreme mental and emotional distress of the inmates.  Plaintiff alleges Sheriff Gore only cares about the integrity of his officers and not the inmates' rights. (*Id.* at 13.)

Plaintiff also alleges that notwithstanding the Sheriff's Department daily orientation video and signs posted on jail walls explaining how to report a sexual assault, when Plaintiff pleaded with two nurses that he needed help following his sexual assault, he was told to notify his supervisor and there was nothing the nurses could do to help.  One of the nurses even questioned how Plaintiff could be sexually assaulted while in a solitary jail cell.  With his pleas for help ignored, Plaintiff attempted suicide one night.  Plaintiff was clearly distraught and he asked to see a psychiatrist but he was told he would need to submit a request.  Plaintiff waited six days to be seen.  Plaintiff alleges there is no policy in place to report a sexual assault other than through the Sheriff's Department.  However, forcing him to report sexual assault to individuals responsible for encouraging and investigating the assault simply subjects Plaintiff to further embarrassment, grief, and torment.  (*Id.* at 14.)

/ / /

9

Finally, Plaintiff alleges the County of San Diego maintains an unconstitutional policy, ordinance, or regulation allowing deputies to single out inmates to use force and conduct unreasonable strip searches that capture inmates' naked bodies on film for the officers' amusement.  Plaintiff alleges the County is deliberately indifferent to widespread unconstitutional acts by its deputies and that the County has failed to set forth appropriate policies regarding the treatment of inmates.   The County also maintains a policy of failing to properly train, supervise, and discipline employees. (*Id.* at 15.)

## II.  PROCEDURAL BACKGROUND

Plaintiff filed his Complaint in this action on July 17, 2014.  (ECF No. 1.) Plaintiff filed a motion for leave to proceed *in forma pauperis* that same day.  (ECF No. 2.)  On August 27, 2014, the Court granted Plaintiff's motion for leave to proceed *in forma pauperis*, determined that Plaintiff's Complaint was sufficient to survive the sua sponte screening required by 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and directed the U.S. Marshal to effectuate service on Plaintiff's behalf.  (ECF No. 4.)

On September 25, 2014, Defendants Babcock, Edge, Gonzalez, Kamoss, Lusardi, Martinez, Montgomery, Navarro, Sobaszek, Spalsbury, and Talamantez filed a Motion to Dismiss Plaintiff's Complaint.  (ECF No. 18.)  The Court set a November 7, 2014 deadline for Plaintiff to oppose the Motion to Dismiss.  (ECF No. 19.)  On November 20, 2014, Plaintiff filed a letter indicating he had not received a copy of Defendants' Motion to Dismiss until November 14, 2014, by which time his opposition deadline had already expired.  (ECF No. 21.)  Plaintiff requested a brief extension of his opposition deadline.   The Court granted Plaintiff's request and continued his opposition deadline to December 12, 2014.  (ECF No. 22.)

Plaintiff did not file a timely opposition by the December 12, 2014 deadline. On January 20, 2015, the Court sua sponte extended Plaintiff's opposition deadline to February 20, 2015.  (ECF No. 23.)  In that order, the Court notified Plaintiff that if he did "not file an opposition by this deadline the Court will presume that he does not

intend to file an opposition and that he has no objection to the Court ruling on Defendants' motion to dismiss based on the papers already submitted." (*Id.* at 1:26-2:2.)  To date, Plaintiff has not filed an opposition to Defendants' Motion to Dismiss.

### III.  LEGAL STANDARDS

**A.**  <u>**Rule 12(b)(6) Motion to Dismiss**</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). For a plaintiff to overcome a Rule 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

"Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984)).  "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) (citing *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1340 (9th Cir. 1995)).  The Court need not, however, "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citing *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994)); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on motion to dismiss, court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

11

"[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Thus, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 570 (when plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.")).  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences [drawn] from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

Because Rule 12(b)(6) focuses on the sufficiency of a claim rather than the claim's substantive merits, "[o]rdinarily, a court may look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  "Generally, a court may not consider material beyond the complaint in ruling on a [Rule] 12(b)(6) motion." *Schneider v. Cal. Dep. of Corr. & Rehab.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998)  A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

/ / /

12

**B.**   <u>Standards Applicable to *Pro Se* Litigants in Civil Rights Actions</u>

"In a civil rights case where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford [the] plaintiff the benefit of any doubt." *Karim–Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). The rule of liberal construction is "particularly important in civil rights cases." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992). In giving liberal interpretation to a *pro se* civil rights complaint, courts may not "supply essential elements of claims that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Id.*; *see also Jones v. Cmty. Redev. Agency*, 733 F.2d 646, 649 (9th Cir. 1984) (finding conclusory allegations unsupported by facts insufficient to state a claim under § 1983).

Nevertheless, a court must give a *pro se* litigant leave to amend his complaint "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted) (citing *Noll v. Carlson*, 809 F.2d 1446, 1447 (9th Cir. 1987)). Thus, before a *pro se* civil rights complaint may be dismissed, the Court must provide the plaintiff with a statement of the complaint's deficiencies. *Karim–Panahi*, 839 F.2d at 623-24. But where amendment of a *pro se* litigant's complaint would be futile, denial of leave to amend is appropriate. *James v. Giles*, 221 F.3d 1074, 1077 (9th Cir. 2000).

## IV.  ANALYSIS

**A.**   <u>Mootness</u>

Defendants first contend Plaintiff's Complaint is moot because he seeks injunctive relief only, he was released from custody on August 24, 2014, and there is no guarantee he will ever be placed in custody in the future. (ECF No. 18-1 at 2:2-12.)

"The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Nw. Envtl. Def. Ctr. v.*

*Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing *United States v. Geophysical Corp. of Alaska*, 732 F.2d 693, 698 (9th Cir. 1984)).  "Generally, an action is mooted when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy."  *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999) (citations omitted); *see also Clark v. City of Lakewood*, 259 F.3d 996, 1011 (9th Cir. 2001); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1108 (9th Cir. 2003).  "To qualify for adjudication in a federal court, a live controversy must exist at all stages of the litigation, not simply at the time plaintiff filed the complaint."  *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1253 (9th Cir. 2007) (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *In re Di Giorgio*, 134 F.3d 971, 974 (9th Cir. 1998)).

A prisoner's release from custody "extinguishes his legal interest in an injunction because it would have no effect on him."  *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1095 (9th Cir. 2004) (citing *Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 871 (9th Cir. 2002)); *see also Preiser*, 422 U.S. at 402-03 (where prisoner challenges conditions of confinement and seeks injunctive relief, transfer to another prison renders request for injunctive relief moot absent evidence of an expectation that prisoner will be transferred back to offending institution); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam) (prisoner's injunctive relief claim against state prison official is moot following transfer to federal prison).

However, "[i]f [Plaintiff] is entitled to collect damages in the event that [he] succeeds on the merits, the case does not become moot even though declaratory and injunctive relief are no longer of any use."  *McQuillion*, 369 F.3d at 1095-96 (citing *Z Channel Ltd. P'ship v. Home Box Office, Inc.*, 931 F.2d 1338, 1341 (9th Cir. 1991)); *Bernhardt*, 279 F.3d at 872.

The Ninth Circuit has recognized several major exceptions to mootness, including for (1) "collateral legal consequences," (2) "wrongs capable of repetition yet evading review," and (3) "voluntary cessation."  *In re Burrell*, 415 F.3d 994, 998 (9th

Cir. 2005).

Here, Plaintiff's claim for injunctive relief is moot given his release from custody on August 24, 2014, and it does not appear that any of the exceptions to mootness apply.   Thus, the Court **RECOMMENDS** that Defendants' Motion to Dismiss the Complaint as being moot should be **GRANTED**.   However, Plaintiff should be permitted an opportunity to amend his Complaint to seek monetary damages.   As noted above, even if injunctive relief is no longer available, the case would not be moot if Plaintiff is entitled to recover monetary damages following success on the merits.

**B.   <u>Federal Claims</u>**

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred."   *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).   It imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue; and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States.   *See* 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc).   Here, there appears to be no dispute that Defendants acted under color of state law in their official capacities as correctional staff at the San Diego Central Jail.   Thus, Plaintiff's federal claims turn on the second inquiry, namely, whether Defendants deprived Plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.   42 U.S.C. § 1983.

**1.    Unreasonable Search and Seizure (Fourth Amendment)**

Plaintiff alleges the May 31, 2014 searches constituted an unreasonable search and seizure.   (ECF No. 1 at 4-6.)

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

a.   <u>Applicable Law</u>

"Loss of freedom of choice and privacy are inherent incidents of confinement." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). However, a prisoner retains certain rights of privacy in his person under the Fourth Amendment.[8] *See Nunez v. Duncan*, 591 F.3d 1217, 1227 (9th Cir. 2010); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (1988); *Grummett*, 779 F.2d at 493, 495-96; *Hopkins v. Fesmire*, No. C 09-2164 CW (PR), 2011 U.S. Dist. LEXIS 37346, at *12 (N.D. Cal. March 28, 2011) ("The Fourth Amendment applies to the invasion of bodily privacy in prisons and jails." (citing *Bull v. San Francisco*, 595 F.3d 964, 974-75 (9th Cir. 2010) (en banc))); *cf. Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984) ("*Hudson I*") (prisoner has no Fourth Amendment right to privacy in his cell). A prisoner's bodily privacy, however, exists only so far as it is not fundamentally inconsistent with prisoner status or incompatible with the legitimate objectives of incarceration. *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Michenfelder*, 860 F.2d at 332. Thus, a state may restrict a prisoner's rights to the extent necessary to further the correctional system's legitimate goals and policies. *Hudson I*, 468 U.S. at 524. Institutional security has been recognized as chief among a state's legitimate goals. *Id.*

In order to test a prisoner's search claims, courts must consider whether a prison regulation or search procedure is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990); *Michenfelder*, 860 F.2d at 331. "[T]he reasonableness of a particular search is determined by reference to the prison context," *Michenfelder*, 860 F.2d at 332, and is tested by applying the following balancing test set forth in *Bell*:

---

[8]   The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (U.S. CONST. amend IV.)

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the *scope* of the particular intrusion, the *manner* in which it is conducted, the *justification* for initiating it, and the *place* which it is conducted.

441 U.S. at 559 (emphasis added) (citations omitted).

Additionally, courts should consider, where appropriate: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)); (2) "whether there are alternative means of exercising the right[s] that remain open to prison inmates," *id.* at 90; (3) whether accommodation of asserted rights would have a "ripple effect" on fellow inmates and prison staff, *id.*; and (4) whether there are any "ready alternatives" to the regulation that fully accommodates the prisoner's rights at de minimis cost to valid penological interests. *Id.* at 90-91; *see also Michenfelder*, 860 F.2d at 331. In analyzing these factors, courts "must accord great deference to prison officials' assessments of their interests: 'Prison administration is . . . a task that has been committed to the responsibility of [the legislative and executive branches], and separation of powers concerns counsel a policy of judicial restraint.'" *Michenfelder*, 860 F.2d at 331 (quoting *Turner*, 482 U.S. at 85).

### b.   Analysis

As an initial matter, the Court recognizes that Plaintiff appears to have sued all Defendants for violating his Fourth Amendment rights. However, as to Defendants Gonzalez, Lusardi, Martinez, Navarro, Sobaszek, Spalsbury, and Talamantez, Plaintiff's Complaint only alleges that these officers were "needlessly present" during the strip search and that they "could as well be guilty of the assult [sic]." (ECF No. 1 at 3.)   Absent allegations that these Defendants personally participated in either search, the Complaint fails to state a Fourth Amendment claim against them. Indeed,

claims that non-supervisory and non-participatory actors were merely present or "could" have participated in an unreasonable search conducted by one of their peers are insufficient to support a claim of personal liability under *Iqbal*.  A plaintiff cannot hold an officer liable without showing "individual participation" in the unlawful conduct.  *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996).  Liability under § 1983 may not be premised on "team liability" or a "team effort."  *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002).  Thus, Plaintiff must allege that each officer was an "integral participant" in the Fourth Amendment violation.  *Chuman*, 76 F.3d at 294-95.  "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation."  *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).  However, "it does require some fundamental involvement in the conduct that allegedly caused the violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (citing *Boyd*, 374 F.3d at 780).  Here, Plaintiff's allegations against the present but non-participatory and non-supervisory Defendants are insufficient.  Therefore, the Court **RECOMMENDS** that Defendants Gonzalez, Lusardi, Martinez, Navarro, Sobaszek, Spalsbury, and Talamantez's Motion to Dismiss Plaintiff's Fourth Amendment claim should be **GRANTED** for failure to state a claim.

Similarly, Plaintiff's Fourth Amendment claim against Defendant Montgomery is also subject to dismissal.  Indeed, Plaintiff does not allege Defendant Montgomery was even present during the strip search.  Rather, Plaintiff alleges Defendant Montgomery investigated the incident, including that she viewed the surveillance footage of the strip search.  (ECF No. 1 at 2.)  These allegations are insufficient to state a Fourth Amendment claim against Defendant Montgomery, and the Court therefore **RECOMMENDS** that her Motion to Dismiss this claim should be **GRANTED**.

In contrast to these Defendants, Plaintiff does allege individual participation by Defendants Babcock and Edge during the strip search.   (ECF No. 1 at 2-3.)

Accordingly, the Court will analyze Plaintiff's Fourth Amendment claim to determine if the alleged actions of Defendants Babcock and Edge are sufficient to state a claim upon which relief can be granted.

In addition, Plaintiff has adequately alleged facts against Defendant Kamoss for purposes of supervisory liability.  A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) (citing *Sims v. Adams*, 537 F.2d 829 (5th Cir. 1976)).  Although "[t]here is no respondeat superior liability under section 1983," *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81 (9th Cir. 1984)), the Ninth Circuit has "long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them."  *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).

In *Starr*, the Ninth Circuit "conclude[d] that a plaintiff may state a [§ 1983] claim against a supervisor . . . based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates."  *Id.* at 1207.  "[T]o be held liable, the supervisor need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury.'"  *Id.* at 1205 (quoting *Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991)).  "Rather, the supervisor's participation could include his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'"  *Id.* at 1205-06 (quoting *Larez*, 946 F.2d at 646); *see also Taylor*, 880 F.2d at 1045 ("A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and

19

1   failed to act to prevent them.").

2       "A defendant may be held liable as a supervisor under § 1983 'if there exists

3   either (1) his or her personal involvement in the constitutional deprivation, or (2) a

4   sufficient causal connection between the supervisor's wrongful conduct and the

5   constitutional violation." *Id.* at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646

6   (9th Cir. 1989)).  "[A] plaintiff must show the supervisor breached a duty to plaintiff

7   which was the proximate cause of the injury." *Redman v. Cnty. of San Diego*, 942

8   F.2d 1435, 1447 (9th Cir. 1991) (quoting *McClellan*, 610 F.2d at 695).  "The requisite

9   causal connection can be established not only by some kind of direct personal

10  participation in the deprivation, but also by setting in motion a series of acts by others

11  which the actor knows or reasonably should know would cause others to inflict the

12  constitutional injury," *Johnson*, 588 F.2d at 743, or by "knowingly refus[ing] to

13  terminate a series of acts by others, which [the supervisor] knew or reasonably should

14  have known would cause others to inflict a constitutional injury." *Dubner v. City &*

15  *Cnty. of S.F.*, 266 F.3d 959, 968 (9th Cir. 2001) (citing *Watkins v. City of Oakland*,

16  145 F.3d 1087, 1093 (9th Cir. 1998); *Larez*, 946 F.2d at 646).

17      Here, Plaintiff alleges Defendant Kamoss, a supervising officer, was present

18  during both searches, was aware of what was occurring and actually directed certain

19  actions by his subordinates, yet he failed to intervene.  Thus, Plaintiff's Fourth

20  Amendment claim based on Defendant Kamoss's role as a supervisor may proceed

21  provided that Plaintiff has adequately alleged a violation of his Fourth Amendment

22  rights.

23      In considering whether the May 31, 2014 searches were "reasonably related to

24  legitimate penological interests," *Turner*, 482 U.S. at 89, the Court notes that

25  "[p]risoners and pretrial detainees in institutional settings may be subjected to strip

26  searches and body cavity searches *if they are conducted in a reasonable manner*."

27  *Hopkins*, 2011 U.S. Dist. LEXIS 37346, at *12 (emphasis added) (citing *Bell*, 441

28  U.S. at 561).   "Generally, strip searches of prisoners don't violate the Fourth

20

Amendment." *Malo v. Hernandez*, No. 13-1781-SJO (JPR), 2014 U.S. Dist. LEXIS 175512, at *17 (C.D. Cal. Nov. 5, 2014) (citing *Michenfelder*, 860 F.2d at 333-34). However, the Supreme Court has "obviously recognized that not all strip search procedures will be reasonable; some could be excessive, vindictive, harassing, or unrelated to any legitimate penological interest." *Michenfelder*, 860 F.2d at 332. With that in mind, the Court turns to the factors set forth in *Bell*.

### i.   *Scope and Manner*

The scope and manner in which the first search (*i.e.*, the pat down search during which an unidentified officer allegedly reached into Plaintiff's underwear) was conducted weighs in favor of a determination of unreasonableness. The Supreme Court has determined that visual body cavity searches performed as a means of preventing prisoners' possession of weapons and contraband are reasonable, even in the absence of probable cause. *See Bell*, 441 U.S. at 558-60. Additionally, the Ninth Circuit has held that visual body cavity searches "involving no touching" are reasonable. *Michenfelder*, 860 F.2d at 332. Here, in contrast, Plaintiff alleges the initial search involved significant touching, indeed, groping and stroking, of his genitalia. (ECF No. 1 at 4.)

The scope and manner in which the second search (*i.e.*, the strip search during which Plaintiff was allegedly required to remove his clothing to show his testicles and rectum cavity) was conducted also weighs in favor of a determination of unreasonableness. Initially, Plaintiff alleges he was ordered to bend over and cough while an officer stood directly behind him despite the fact that Plaintiff had already submitted to a cavity inspection in which he demonstrated he had no additional contraband. (ECF No. 1 at 6.) Defendants make no effort to explain how this aspect of the search, when it was apparent Plaintiff no longer possessed contraband, was "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Moreover, in *Byrd*, the Ninth Circuit found that the manner in which a strip search was conducted weighed in favor of unreasonableness in part because "[t]en to fifteen

non-participating officers watched the strip search, and at least one person videotaped the search."  629 F.3d at 1143.  Here, Plaintiff similarly alleges that the second search was recorded and that ten officers gathered to watch the strip search even though Plaintiff was not resisting or combative and that he had no history of violence to staff or inmates.  (ECF No. 1 at 5.)

Defendants contend the search was reasonable because "Plaintiff was a 'greenbander' with a high level risk classification . . . due to being an escape risk with prior discipline, including possession of razor blades."  (ECF No. 18-1 at 4:8-10.) However, Plaintiff's Complaint alleges he has no knowledge of an escape attempt and that prison officials later determined the razors were not Plaintiff's razors.  (ECF No. 1 at 11.)  Accepting these allegations as true, and acknowledging that deference is due to prison officials' decision regarding the number of officers present, the Court finds, for purposes of this Motion to Dismiss, that the excessive number of officers who gathered to witness the strip search weighs in favor of a finding of unreasonableness as to the second search.

"The prisoner bears the burden of showing that prison officials intentionally used exaggerated or excessive means to enforce security in conducting a search." *Hopkins*, 2011 U.S. Dist. LEXIS 37346, at *14 (citing *Thompson v. Souza*, 111 F.3d 694, 700 (9th Cir. 1997)).  The Court finds that Plaintiff has satisfied his burden of alleging that the scope and manner of both searches was unreasonable.

### ii.    Justification

The justification of the searches weighs in favor of a determination of reasonableness.  Plaintiff was admittedly hiding contraband in his underwear.  Thus, even though the contraband consisted of socks and did not pose an immediate danger, the officers were justified in performing the searches to remove the contraband.

### iii.    Place

The final *Bell* factor, the place of the search, weighs in favor of a finding of reasonableness as to the initial "pat down" search.  Plaintiff alleges only that the

22

1   search occurred after he was removed from his cell, but before he was taken to a

2   private room.  (ECF No. 1 at 4-5.)  Thus, the Complaint fails to allege any facts upon

3   which the Court can infer that the place of the initial search favors a finding of

4   unreasonableness.

5          In contrast, this factor weighs in favor of a finding of unreasonableness as to the

6   second search.  Following the initial "pat down" search, Plaintiff was searched in a

7   private room away from the presence of other inmates.  In *Byrd*, the Ninth Circuit

8   concluded that the location of a search was reasonable when it was performed in a

9   common room with other inmates present "making it less likely that improper conduct

10  would occur."  629 F.3d at 1143 (citing *Thompson*, 111 F.3d at 701 (upholding visual

11  strip search of inmate that took place on the tier just outside the inmate's cell within

12  view of other prisoners)).  That did not occur here.

13                                *v.    Conclusion*

14         In conclusion, the Court finds that the *Bell* factors, on balance, weigh in favor

15  of a determination of unreasonableness as to both searches.  As to the first search,

16  "[a]lthough the last two factors weigh in favor of a determination of reasonableness,

17  the effect of the first two factors is so extreme that a conclusion of unreasonableness is

18  compelled."  *Byrd*, 629 F.3d at 1143.  Indeed, the sexually suggestive nature of the

19  first search is compelling.  As to the second search, the *Bell* factors, on balance, also

20  weigh in favor of a determination of unreasonableness.  During the search, which

21  occurred outside the presence of other inmates, Plaintiff was surrounded by ten

22  officers.

23         Accordingly, the Court **RECOMMENDS** that Defendants Babcock, Edge, and

24  Kamoss's Motion to Dismiss Plaintiff's unreasonable search claim under the Fourth

25  Amendment should be **DENIED**.[9]

26

27  _____

28  [9]    Plaintiff's Fourth Amendment claim against Defendants Babcock and Edge is
     sufficiently alleged only as to the second search during which they allegedly forcibly

**2.     Cruel & Unusual Punishment/Excessive Force (Eighth Amendment)**

Plaintiff alleges the May 31, 2014 searches amounted to cruel and unusual punishment and involved excessive use of force.  (ECF No. 1 at 4-6.)[10]

a.     Applicable Law

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) ("The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from

---

removed Plaintiff's clothing.  (ECF No. 1 at 2-3, 5-6.)   Plaintiff's vague and speculative allegation that they may have been involved during the first search is insufficient.

[10]     The Court notes that it is not readily apparent based on the Court's review of the record whether the incidents alleged in Plaintiff's Complaint occurred while he was in pretrial custody or whether they occurred subsequent to his conviction.  On one hand, the May 31, 2014 incident occurred at the San Diego Central Jail, a facility that generally houses pretrial detainees.  Plaintiff was subsequently transferred to GBDF and it was while incarcerated at GBDF that Plaintiff filed his Complaint.  On the other hand, the incident occurred twenty-eight months into an eventual thirty-one month incarceration.  Given the length of incarceration prior to the May 31, 2014 incident, the Court assumes Plaintiff was serving out his sentence at that time.  Accordingly, the Court will analyze Plaintiff's claims by applying standards applicable to post-conviction detainees.  In any event, the Ninth Circuit appears to apply those same standards to claims by inmates in pretrial custody.  *See Bell*, 441 U.S. at 535 n.16 (pretrial detainees may raise conditions of confinement claims under the Due Process Clause of the Fourteenth Amendment rather than the protections against cruel and unusual punishment afforded by the Eighth Amendment as do post-conviction inmates); *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010) ("Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, we apply the same standards in both cases."); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (standard for analyzing rights of pretrial detainees under the Due Process Clause is similar to that under the Eighth Amendment).

24

inhumane methods of punishment but also from inhumane conditions of confinement.").  "Whatever rights one may lose at the prison gates, . . . the full protection of the eighth amendment most certainly remains in force.  The whole point of the amendment is to protect persons convicted of crimes."  *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979).

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of the inmates."  *Hudson I*, 468 U.S. at 526-27; *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").  "Protecting the safety of prisoners and staff involves difficult choices and evades an easy solution."  *Berg v. Kincheloe*, 794 F.2d 457, 460 (9th Cir. 1986).

Due to the "restrictive and harsh" nature of a prison setting, a prisoner's injury does not automatically constitute a constitutional violation.  *Morgan*, 465 F.3d at 1045.  To prove cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain."  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  The prisoner first must "objectively show that he was deprived of something 'sufficiently serious.'"  *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Farmer*, 511 U.S. at 834 (a "sufficiently serious" deprivation is one that poses "a substantial risk of serious harm." (citing *Helling*, 509 U.S. at 35)).  If the prisoner can show his deprivation was objectively sufficiently serious, he must generally then make "a subjective showing that the deprivation occurred with deliberate indifference to [his] health or safety."  *Id.* at 812 (9th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834); *see also Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," evidence must exist to show the defendant acted with a "sufficiently

culpable state of mind."); *see also Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc) ("[W]here an inmate alleges that the conditions of confinement inflict unnecessary suffering upon him or her, to establish wantonness the inmate must show only that the prison officials were deliberately indifferent to the inmate's suffering." (citing *Wilson*, 501 U.S. at 302-03).

"In contrast, when prison officials use force to maintain order, a greater showing is required; in that situation, wantonness turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Jordan*, 986 F.2d at 1528 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) ("*Hudson II*")). "The reasons for this distinction are plain. Whether in the context of a prison-wide disturbance or an individual confrontation between an officer and prisoner, corrections officers often must act immediately and emphatically to defuse a potentially explosive situation." *Id.* (citing *Williams v. Burton*, 943 F.2d 1572, 1575-76 (11th Cir. 1991)). "In such a situation, officers must make difficult judgments whether, and how much, force is appropriate." *Id.* "The officer rarely has time for reflection; instead, the decision to use force must be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* (quoting *Hudson II*, 503 U.S. at 6). Application of the heightened standard is appropriate to prevent the chilling effect that after-the-fact criticism would have on prison officials' effective conduct. *Id.*

     b.   <u>Analysis</u>

Plaintiff alleges various violations of the Eighth Amendment's prohibition against cruel and unusual punishment stemming from the May 31, 2014 searches. Specifically, Plaintiff alleges: (1) during the "pat down" search an unknown officer pulled on Plaintiff's testicles while searching for hidden socks and twice reached inside Plaintiff's underwear and was "feeling around on [Plaintiff's] privates" and "obviously stroking [Plaintiff's] penis" (ECF No. 1 at 4); (2) Defendants Babcock and Edge forcefully removed Plaintiff's clothing after Plaintiff had already submitted to a

cavity inspection (*id.* at 2-3); (3) Defendant Babcock commanded Plaintiff to bend over and cough (*id.* at 2); (4) Defendant Edge made physical contact with Plaintiff while Plaintiff was completely naked (*id.* at 3); (5) Defendant Kamoss failed to intervene during the improper searches (*id.* at 2, 4-6); and (6) Defendant Kamoss called Plaintiff a queer (*id.* at 7).

As an initial matter, the Court notes that claims of verbal harassment or abuse of prisoners by guards do not state a constitutional deprivation under § 1983.  *See Somers v. Thurman*, 109 F.3d 614, 622 (9th Cir. 1997) ("[T]he exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons" of which "we do not approve," but which do not violate the Eighth Amendment.); *Morgan v. Ward*, 699 F. Supp. 1025, 1055 (N.D.N.Y. 1988) ("[T]he exchange of verbal insults between inmates and guards is a constant, daily ritual."). This is true even when the verbal harassment has sexual undertones.  "Although prisoners have a right to be free from sexual abuse, whether at the hands of fellow inmates or prison guards, *see Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000), the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment."  *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004) (citing *Blueford v. Prunty*, 108 F.3d 251, 254-55 (9th Cir. 1997) (holding that prison guard who engaged in "vulgar same-sex trash talk" with inmates was entitled to qualified immunity); *Somers*, 109 F.3d at 624).  Thus, Plaintiff's allegation that Defendant Kamoss called him a queer (ECF No. 1 at 7) fails to state a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

Next, Plaintiff has failed to sufficiently allege that he suffered an objectively sufficiently serious deprivation in connection with the May 31, 2014 searches.[11]

---

[11]     Because the Court concludes Plaintiff's Complaint fails to allege an objectively sufficiently serious deprivation, the Court does not reach the issue of whether the deliberate indifference or "malicious and sadistic" standard applies in this case.

27

Plaintiff alleges that during the "pat down" search he was subjected to an unknown officer[12] "obviously stroking on [Plaintiff's] penis" while feeling around for unauthorized clothing and that the officer was "pulling [Plaintiff's] testicles and socks towards [his] rear."  (ECF No. 1 at 4.)

"[P]risoners have a right to be free from sexual abuse, whether at the hands of fellow inmates or prison guards." *Austin*, 367 F.3d at 1171 (citing *Schwenk*, 204 F.3d at 1197) ("A sexual assault on an inmate by a [prison employee] . . . is deeply offensive to human dignity" and violates the Eighth Amendment.); *see also Hopkins*, 2011 U.S. Dist. LEXIS 37346, at *11 ("Sexual assault, coercion and harassment certainly may violate contemporary standards of decency and cause physical and psychological harm." (citing *Jordan*, 986 F.2d at 1525-31)); *Smith v. L.A. Cnty.*, No. CV 07-7028-VAP (MAN), 2010 U.S. Dist. LEXIS 61985, at *4 (C.D. Cal. Apr. 22, 2010) ("Rape or other sexual assault perpetrated by a guard against an inmate is offensive to human dignity and violates the Eighth Amendment regardless of lasting physical injury." (citing *Schwenk*, 204 F.3d at 1196-97)); *Hill v. Mims*, No. 1:09-cv-01202-LJO-SMS PC, 2009 U.S. Dist. LEXIS 122942, at *1 (E.D. Cal. Dec. 23, 2009) ("The sexual abuse of an inmate by [a] jail employee clearly violates the Eighth Amendment." (citing *Schwenk*, 204 F.3d at 1196-97)).

"Yet, not every 'malevolent touch by a prison guard' violates the Eighth Amendment." *Ganner v. Gibson*, No. CIV S-08-1445 GGH P, 2009 U.S. Dist. LEXIS 107755, at *4-5 (E.D. Cal. Nov. 2, 2009) (quoting *Hudson II*, 503 U.S. at 9).  Rather, as the Supreme Court has recognized, "*de minimis* uses of physical force" do not

---

[12]      Plaintiff's allegations that Defendants Babcock, Edge, Gonzalez, Lusardi, Martinez, Navarro, Sobaszek, Spalsbury, and Talamantez may have been involved in the sexual assault are too vague, conclusory, and "devoid of . . . 'factual enhancement'" to permit the Court "to draw the reasonable inference" that these Defendants engaged in the alleged sexual assault.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

violate the Eighth Amendment's prohibition of cruel and unusual punishment "provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  *Hudson II*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327); *see also Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998)).  Numerous district courts in California have held that "[a] prisoner . . . must establish that the alleged sexual harassment was egregious, pervasive and/or widespread in order to state a claim under the Eighth Amendment."  *Palacio v. Mendocino Cnty. Sheriff's Dep't*, No. 15-cv-00393-DMR (PR), 2015 U.S. Dist. LEXIS 53052, at *5 (N.D. Cal. April 22, 2015) (citing *Jordan*, 986 F.2d at 1525-31; *Watson v. Jones*, 980 F.2d 1165, 1165-66 (8th Cir. 1992)); *see also Palmer v. O'Connor*, No. 2:11-cv-2927 KJN P, 2013 U.S. Dist. LEXIS 110700, at *6 (E.D. Cal. Aug. 5, 2013) (same); *Trotter v. Haws*, No. CV 09-5400 JVS (JCG), 2011 U.S. Dist. LEXIS 79096, at *4 (C.D. Cal. June 10, 2011) (same).

Here, Plaintiff's allegations concerning the "pat down" incident do not amount to "egregious, pervasive and/or widespread" sexual harassment.  In *Trotter*, the inmate plaintiff alleged that a prison guard touched the plaintiff "in [a] lewd stroking manner[] on his arms[,] frontal [area,] and between [his] legs."  2010 U.S. Dist. LEXIS 141715, at *12.  The court found that, "[w]ithout more, such allegations, akin to a typical safety pat down, do not rise above the 'de minimis' level that would implicate a harm of constitutional magnitude.  In other words, Plaintiff has failed to sufficiently plead that the alleged sexual harassment was 'egregious, pervasive and/or widespread.'"  *Id.* (quoting *John-Charles v. Abanico*, No. C 07-05786 CW (PR), 2010 U.S. Dist. LEXIS 8065, at *4 (N.D. Cal. Feb. 1, 2010)) (citing *Berryhill*, 137 F.3d at 1075-77 (no Eighth Amendment violation based on prison employee's "brief unwanted touch [of an inmate's] buttocks"); *Boddie v. Schnieder*, 105 F.3d 857, 859-61 (2nd Cir. 1997) (no Eighth Amendment violation where prison guard touched inmate's penis and pressed inmate against wall in a sexual manner); *Rice v. King Cnty.*, No. 99-35257, 2000 U.S. App. LEXIS 29897, at *3 (9th Cir. 2000) (no Eighth

29

Amendment violation where prison guard "shoved her hand very hard into" inmate's testicles during a search); *Ganner*, 2009 U.S. Dist. LEXIS 107755, at *2 (no Eighth Amendment violation where prison guard "rubbed [inmate's] legs, thighs and buttocks" during a search). Here, Plaintiff's allegations are similarly insufficient to rise above the "de minimis" level required to plead that the alleged sexual harassment was egregious, pervasive, and/or widespread.

For these same reasons, Plaintiff's allegation that Defendants Babcock and Edge forcibly removed his clothing during the subsequent strip search, that Defendant Edge made physical contact with Plaintiff while Plaintiff was completely naked during that search, and that Defendant Babcock ordered Plaintiff to bend over and cough (ECF No. 1 at 2-3, 5-6) are insufficient to state a cognizable Eighth Amendment claim. "A visual body-cavity search does not violate the Eighth Amendment if it is justified by legitimate penological interests and not conducted solely to inflict pain or humiliation." *Malo*, 2014 U.S. Dist. LEXIS 175512, at *9 (citing *Somers*, 109 F.3d at 622-23). "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson II*, 503 U.S. at 9; *see also Malo*, 2014 U.S. Dist. LEXIS 175512, at *8 ("In an Eighth Amendment claim based on a strip search, the plaintiff must allege a risk of harm beyond a 'momentary discomfort.'" (quoting *Jordan*, 986 F.3d at 1521)). If the use of tasers to enforce compliance with a search does not violate the Eighth Amendment, *see Michenfelder*, 860 F.2d at 335, the Court finds it very difficult to accept that the forceful removal of clothing to enforce compliance with a strip search amounts to punishment or infliction of pain in violation of the Eighth Amendment.

Finally, because Plaintiff fails to allege a violation of his Eighth Amendment rights there is no basis to find any supervisor, including Defendant Kamoss, liable for violating Plaintiff's Eighth Amendment rights by failing to intervene. *See Starr*, 652

14cv1691-WQH (DHB)

F.3d at 1207 ("[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates."); *Redman*, 942 F.2d at 1447 ("The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present *and the plaintiff was deprived under color of law of a federally secured right*.") (emphasis added) (quoting *McClelland v. Facteau*, 610 F.2d 693, 695 (10th Cir. 1979)).[13]

As a result, Plaintiff's Complaint fails to state an Eighth Amendment cruel and unusual punishment or excessive force claim upon which relief can be granted. Accordingly, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's Eighth Amendment cruel and unusual punishment and excessive force claims should be **GRANTED**.

### 3.    Invasion of Privacy (Fourteenth Amendment)[14]

Plaintiff alleges his privacy rights were violated when he was subjected to the May 31, 2014 strip searches and because the second search was recorded and later shown to three female prison staff members, including Defendant Montgomery. (ECF No. 1 at 4-5, 8-9.)

---

[13]    Plaintiff's allegation that Defendants Gonzalez, Lusardi, Martinez, Navarro, Sobaszek, Spalsbury, and Talamantez failed to intervene during the assault (ECF No. 1 at 3) are insufficient for Eighth Amendment liability both because they are not alleged to be supervisors and because there is no underlying Eighth Amendment violation upon which supervisor liability can rest.

[14]    To the extent Plaintiff's invasion of privacy claim is construed as arising under the California Constitution as opposed to the Fourth Amendment, the Court notes that "in the search and seizure context, the Article I, Section I privacy clause of the California Constitution has not been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution." *Arroyo v. Tilton*, No. 1:11-cv-01186 DLB PC, 2012 U.S. Dist. LEXIS 60269, at *17 (E.D. Cal. April 27, 2012) (citing *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 903 (9th Cir. 2008); *Sanchez v. Cnty. of San Diego*, 464 F.3d 916, 943 (9th Cir. 2006)).

a.   <u>Applicable Law</u>

"While no 'right of privacy' is expressly guaranteed by the Constitution, the Supreme Court has recognized that 'zones of privacy' may be created by specific constitutional guarantees, thereby imposing limits upon governmental power." *Grummett*, 779 F.2d at 493 (citing *Paul v. Davis*, 424 U.S. 693, 712-13 (1976); *Roe v. Wade*, 410 U.S. 113, 152-153 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 484-86 (1965)). "The Supreme Court has pointed out that rights found in the guarantee of personal privacy are limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty.'" *Id.* (quoting *Roe*, 410 U.S. at 152).

"[I]ncarcerated prisoners retain a limited right to bodily privacy. Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex[,] is impelled by elementary self-respect and personal dignity." *Michenfelder*, 860 F.2d at 333 (citing *Grummet*, 779 F.2d at 494; *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) ("Although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether.")).

Allegations of privacy right violations in the prison context are analyzed under the *Turner* rational relationship test by which courts determine whether an invasion of privacy is "reasonably related to legitimate penological interests." *Michenfelder*, 860 F.2d at 334 (quoting *Turner*, 482 U.S. at 89).

b.   <u>Analysis</u>

The Court concludes that Plaintiff's first argument offered in support of his invasion of privacy claim (*i.e.*, that he was subjected to strip searches in which either his genitalia were touched by a prison guard or he was required to strip naked and show his testicles and rectum to ten guards) fails to state a claim. "Unpleasant physical measures – e.g., a strip search – may be necessary to secure the safety of an institution even though they impinge on the dignity of innocent inmates." *Wagner v. Cnty. of Maricopa*, 706 F.3d 942, 948 (9th Cir. 2013) (citing *Bull*, 595 F.3d 964).

32

Plaintiff's next privacy argument (*i.e.*, that the second search was recorded and later shown to three female officers) is similarly insufficient.  Although the law in the Ninth Circuit "respects an incarcerated prisoner's right to bodily privacy, . . . assigned positions of female guards that require only infrequent and casual observation, or observation at a distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference."  *Michenfelder*, 860 F.2d at 334 (citing *Grummett*, 779 F.2d at 494-95; *Smith v. Chrans*, 629 F. Supp. 606 (C.D. Cal. Ill. 1986); *Bagley v. Watson*, 579 F. Supp. 1099, 1103 (D. Or. 1983)).  Plaintiff does not allege that "female officers regularly or frequently observe unclothed inmates without a legitimate reason for doing so."  *Id.*  Moreover, in *Michenfelder*, the Ninth Circuit reasoned that "[p]rohibiting female employees from working in the control bubble, or requiring them to be replaced by males for the duration of strip searches, would displace officers throughout the prison.   The prison's current allocation of responsibilities among male and female employees already represents a reasonable attempt to accommodate prisoners' privacy concerns consistent with internal security needs and equal employment concerns."  *Id.* (citing *Grummet*, 779 F.2d at 496). Similarly, here, there is no allegation that female guards were present during the searches, and requiring subsequent investigations to be handled only by male officials would disrupt the prison's allocation of resources and raise equal employment concerns.

Accordingly, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's invasion of privacy claim should be **GRANTED**.

### 4.     Due Process (Fourteenth Amendment)

Plaintiff alleges his procedural due process rights were violated as of a result of the disciplinary hearing following the May 31, 2014 searches.  (ECF No. 1 at 10-11.) Specifically, Plaintiff alleges (a) he was punished with a three-day lockdown for violating several rules prior to any adjudication of his guilt; (b) the hearing officer, Defendant Navarro, was present during the search and, therefore, had a biased opinion

14cv1691-WQH (DHB)

as to Plaintiff's guilt; (c) Defendant Navarro lied and claimed Plaintiff pleaded guilty to disobeying staff instructions when Plaintiff actually only pleaded guilty to possession of excess clothing; and (d) the incident report was altered to include six sentences without Plaintiff's knowledge and without giving Plaintiff an opportunity to defend the new charges.  (ECF No. 1 at 10-11.)  Plaintiff also alleges Defendant Montgomery failed to conduct a fair and thorough investigation in that she (a) did not interview all involved parties; (b) told Plaintiff that officers are permitted to touch him; (c) intentionally covered up staff misconduct; and (d) ignored the accusations Plaintiff presented to her.  (*Id.* at 7.)

Plaintiff also appears to allege due process violations in connection with a February 2012 determination that he was a flight risk and a February 2013 placement in Administrative Segregation as a result of having possession of illegal razors.  (*Id.* at 11-12.)

> a.   Applicable Law

The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."  *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972).  "To state a procedural due process claim, [a plaintiff] must allege '(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process.'"  *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)).

However, the Ninth Circuit has held that prisoners have no protected property interest in an inmate grievance procedure arising directly from the Due Process Clause.  *See Ramirez v. Galaza*, 334 F.3d 850, 869 (9th Cir. 2003) ("[I]nmates lack a separate constitutional entitlement to a specific prison grievance procedure") (citing *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) (finding that the due process clause

34

of the Fourteenth Amendment creates "no legitimate claim of entitlement to a [prison] grievance procedure")).

In addition to liberty interests that arise directly from the Constitution, courts have long recognized that state prison regulations may give rise to liberty interests that are protected by the Fourteenth Amendment. *See Meachum v. Fano*, 427 U.S. 215, 223-27 (1976); *Wolff v. McDonnell*, 418 U.S. 418, 557-58 (1974). Nonetheless, the interest created by the regulation must be something more than freedom from the restrictions ordinarily contemplated by a prison sentence. *Sandin v. Connor*, 515 U.S. 472, 483-87 (1995). The interests created by state prison regulations are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force [citations omitted], nonetheless impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. "*Sandin* . . . refocused the test for determining the existence of a liberty interest away from the wording of prison regulations and toward an examination of the hardships caused by the prison's challenged action relative to 'the basic conditions' of life as a prisoner." *Mitchell v. Dupnik*, 75 F.3d 517, 522 (9th Cir. 1996) (quoting *Sandin*, 515 U.S. at 485).

b.   Analysis

Plaintiff's allegation that he was placed in lockdown for three days immediately following the May 14, 2014 searches fails, as a matter of law, to constitute a protected liberty interest under *Sandin*. In *Hayward v. Procunier*, 629 F.2d 599, 601-02 (9th Cir. 1980), the Ninth Circuit held that an institute-wide, six week lockdown was not outside the foreseeable consequences of a criminal conviction and thus did not constitute an "atypical and significant hardship." Accordingly, Plaintiff fails to plead facts sufficient to show that any Defendant deprived him of a protected liberty interest in connection with the investigation and discipline imposed following the May 31, 2014 incident.

Next, Plaintiff's due process claims regarding his February 2012 classification as an escape risk and the February 2013 placement in Administrative Segregation for possession of razors are not alleged against any of the Defendants that filed the Motion to Dismiss.  Thus, their Motion to Dismiss should be granted as to them.

Finally, the due process claim stemming from the February 2012 escape risk classification is barred by the two-year statute of limitations imposed by California Code of Civil Procedure § 335.1.  *See Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004).

In conclusion, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's due process claim should be **GRANTED**.

**5.     Deliberate Indifference to Medical Needs (Eighth Amendment)**

Plaintiff alleges medical staff was deliberately indifferent to his medical needs following the May 31, 2014 searches.  (ECF No. 1 at 14.)  Specifically, Plaintiff alleges he informed two unidentified nurses multiple times that he had been a victim of sexual assault but that the nurses told him there was nothing they could do and that he should inform the officers.  (*Id.* at 14.)  One of the nurses even allegedly expressed skepticism that Plaintiff could have been sexually assaulted while alone in his jail cell. (*Id.*)

Defendants contend "Plaintiff does not allege that any of these Defendants [*i.e.*, the named Defendants who have brought the instant Motion to Dismiss] failed to respond to his request."  (ECF No. 18-1 at 7:10.)  Defendants argue Plaintiff has failed "to state a claim for deliberate indifference to a serious risk of harm and fail[ed] to allege that these Defendants were made aware of any risk."  (*Id.* at 7:20-21.)

a.     Applicable Law

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  This principle "establish[es] the government's obligation to provide medical care for those whom it is punishing by

36

incarceration." *Id.*  The Supreme Court has noted that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.*; *see also West v. Atkins*, 487 U.S. 42, 54-55 (1988).

Prison officials violate a prisoner's Eighth Amendment right to be free from cruel and unusual punishment if they are deliberately indifferent to his serious medical needs.  *See Gamble*, 429 U.S. at 106; *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Gamble*, 429 U.S. at 104-05 (footnotes omitted).  To establish deliberate indifference to serious medical needs, the Ninth Circuit requires a two-step inquiry.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

First, the prisoner must have a serious medical need.  *Id.*  "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting *Gamble*, 429 U.S. at 104), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  In making this determination, courts should consider whether "a reasonable doctor or patient would find [the prisoner's condition] important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990); *Hunt*, 865 F.2d at 200-01).

Second, the prisoner must establish that prison officials exhibited deliberate indifference to the serious medical need. *Jett*, 439 F.3d at 1096.  This requirement "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or

possible medical need and (b) harm caused by the indifference." *Id.* (citing *McGuckin*, 974 F.2d at 1059). The indifference to medical needs also must be substantial; inadequate treatment due to malpractice, or even gross negligence, does not amount to a constitutional violation. *Gamble*, 429 U.S. at 106; *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment.") (citing *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) ("Mere medical malpractice does not constitute cruel and unusual punishment."); *Wood*, 900 F.2d at 1334 (stating that even gross negligence is insufficient to establish a constitutional violation)).

The deliberate indifference standard includes a subjective intent requirement and is not met "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In order to show deliberate indifference, an inmate must allege sufficient facts to indicate that prison officials acted with a culpable state of mind. *Wilson*, 501 U.S. at 297. Courts must focus on the seriousness of the prisoner's medical needs and the nature of the defendants' response to those needs. *See McGuckin*, 974 F.2d at 1059. Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Deliberate indifference can be established when "prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *McGuckin*, 974 F.2d at 1059. However, a mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay or denial was harmful. *Id.* at 1060 (quoting *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)); *Hunt*, 865

F.2d at 200 ("[D]elay in providing a prisoner with dental treatment, standing alone, does not constitute an [E]ighth [A]mendment violation."). While the harm caused by delay need not necessarily be "substantial," *McGuckin*, 974 F.2d at 1060 & n.12, the Eighth Amendment is violated if "delays occurred to patients with problems so severe that delays would cause significant harm and that Defendants should have known this to be the case," *Hallett*, 296 F.3d at 746, and "a finding that the inmate was seriously harmed by the defendant's action or inaction tends to provide additional support to a claim that the defendant was 'deliberately indifferent' to the prisoner's medical needs: the fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering." *McGuckin*, 974 F.2d at 1060 (citing *Gamble*, 429 U.S. at 106).

b.   Analysis

As an initial matter, the Court believes that Plaintiff has sufficiently alleged that his medical needs were "serious." Indeed, Plaintiff alleges he was a victim of sexual assault that ultimately resulted in a suicide attempt. (ECF No. 1 at 14.) Although Plaintiff does not allege any physical injury resulted from the assault, he sufficiently alleges a negative impact on his psyche to warrant medical treatment. *See McGuckin*, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment . . . [is an example] of indications that a prisoner has a 'serious' need for medical treatment.").

However, Plaintiff fails to adequately allege that any of the Defendants were deliberately indifferent to his serious medical needs. Plaintiff has not alleged any facts to support a finding that Defendants acted with a culpable state of mind in connection with his complaints to nursing staff, *see Wilson*, 501 U.S. at 297, nor has Plaintiff alleged facts to support a finding that Defendants disregarded an excessive risk to Plaintiff's health or safety. *See Farmer*, 511 U.S. at 837. In fact, not only does Plaintiff make no allegation that he informed any of the named Defendants of a

serious medical need, but his Complaint suggests he intentionally did not because, according to Plaintiff, doing so would have further subjected Plaintiff to embarrassment, grief, and torment.  (ECF No. 1 at 14.)   Additionally, although Plaintiff alleges he waited six days after submitting a request to see a psychiatrist (*id.*), his Complaint contains no facts suggesting this delay in treatment is attributable to any of the named Defendants.  *See Austin*, 367 F.3d at 1172 (denying deliberate indifference to medical needs claim where there was no "evidence that [defendant] acted intentionally to deny, delay, or interfere with [plaintiff's] mental health treatment.").

In conclusion, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's claim for deliberate indifference to medical care should be **GRANTED**.

## C.    State Law Claims

Plaintiff's Complaint also contains numerous state law claims.   Defendants argue the state law claims are subject to dismissal because Plaintiff fails to allege compliance with the California Government Claims Act.  (ECF No. 18-1 at 5:13-16, 24-25; 6:15-17.)   However, the Government Claims Act must be satisfied before bringing a "suit for money or damages" against a public entity and its employees. CAL. GOV'T CODE § 945.4; *see also Windham v. Marin*, No. 1:14-cv-01636-LJO-BAM (PC), 2015 U.S. Dist. LEXIS 40842, at *16-17 (E.D. Cal. March 30, 2015). Here, Plaintiff's Complaint seeks only injunctive relief.  *See supra* Part IV.A.  Of course, if Plaintiff were to amend his Complaint to seek monetary damages, he would also need to allege facts demonstrating compliance with the claim presentation requirements.  At the moment, however, the Government Claims Act does not apply.

### 1.    California Penal Code § 4030

Plaintiff alleges the May 31, 2014 search during which an officer pulled on Plaintiff's testicles and stroked his penis constitutes an "illegal touching" in violation

40

of California Penal Code §4030.[15]   (ECF No. 1 at 4.)   However, as Defendants correctly observe (*see* ECF No. 18-1 at 2:24-25), Penal Code § 4030 expressly applies "only to prearraignment detainees arrested for infraction or misdemeanor offenses and to any minor detained prior to a detention hearing." CAL. PENAL CODE § 4030(b); *see also Lopez v. Youngblood*, 609 F. Supp. 2d 1125, 1141-42 (E.D. Cal. 2009) (rejecting prisoner's argument that county and county jail officials should have extended the protections of Penal Code § 4030 to all detainees).

Moreover, Plaintiff cannot sue Defendants for violation of the Penal Code. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-86 (2002) (basing a claim on an implied private right of action requires a showing that the statute both contains explicit rights-creating terms and manifests an intent to create a private remedy); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1048 (9th Cir. 2006) (no private right of action for violation of criminal statutes).

Accordingly, Plaintiff cannot state a cognizable § 1983 claim for violation of California Penal Code § 4030, and the Court **RECOMMENDS** that Defendants' Motion to Dismiss this claim should be **GRANTED**.

---

[15]   California Penal Code § 4030 was enacted to address the California legislature's concern that "law enforcement policies and practices for conducting strip or body cavity searches of detained persons vary widely throughout California" and that, as a result, "[s]ome present search practices violate state and federal constitutional rights to privacy and freedom from unreasonable searches and seizures." CAL. PENAL CODE § 4030(a).  In an effort to "strictly limit[] strip and body cavity searches," *id.*, the legislature created numerous protections for individuals subject to such searches, including, but not limited to, the establishment of requirements of pre-search written authorization from a supervising officer (for strip searches and visible body cavity searches) or the issuance of a search warrant (for physical body cavity searches); prohibitions against touching the breasts, buttocks, or genitalia of the person being subjected to a strip search or visual body cavity search; prohibitions against the presence of opposite sex individuals other than certain medical personnel; and requirements that the search be conducted in a private area. *See* CAL. PENAL CODE § 4040(f), (j), (l), (m).

## 2.   Battery

According to the California Penal Code, "[a] battery is any willful and unlawful use of force or violence upon the person of another."   CAL. PENAL CODE § 242. "Harmful or offensive contact, intentionally done, is the essence of battery."   5 B.E. Witkin, *Summary of Cal. Law*, Torts § 383 (10th ed. 2005) (citations omitted).   The elements of a battery claim in California are that: (1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plaintiff's person; (2) the plaintiff did not consent to the contact; and (3) the contact caused injury, damage, loss, or harm to the plaintiff.   *Cole v. Doe 1 thru 2 Officers of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005).

Defendant argues Plaintiff's battery claim must fail because a state law battery claim arising out of the same use of force as an Eighth Amendment claim brought under § 1983 must apply the same analysis for both claims.   (ECF No. 18-1 at 6:17-23.)   The Court agrees.   In *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274 (Cal. Ct. App. 1998), the California Court of Appeal reasoned that "[t]o avoid jury confusion and to ease judicial administration, it makes sense to require plaintiff to prove unreasonable force on both [his § 1983 excessive force and state law battery] claims."   The Sixth Circuit has implemented a parallel rule: "Where a plaintiff asserts a battery claim under [state] law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action.   That is, 'whether the analysis concerns whether an officer violated a plaintiff's constitutional rights by using excessive force or whether the analysis concerns whether an officer committed state-law battery by using force that was 'clearly excessive,' the same principles . . . are applied.'"   *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010) (quoting *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 596 F. Supp. 2d 1101, 1118 (M.D. Tenn. 2009) (holding that officers entitled to summary judgment on a § 1983 excessive force claim were automatically entitled to summary judgment on the state law battery claim)) (citing *Harris v. Metro. Gov't of Nashville*, No. 3:06-0868,

2007 U.S. Dist. LEXIS 92895, at *9 (M.D. Tenn. Dec. 18, 2007) ("[T]he plaintiff has set forth adequate grounds for his [§ 1983] claim of excessive force against each of the officers.  Because Tennessee courts apply the same 'excessive force' principles to assault and battery claims against police officers, the plaintiff has additionally set forth adequate grounds against each of the officers for assault and battery under Tennessee law.").

Here, although Defendants point to no controlling federal law suggesting the Court should follow the reasoning applied by the Sixth Circuit, nor has the Court located any, the Court finds it appropriate to do so given that California courts have treated state law battery claims the same as excessive force claims brought pursuant to § 1983.  *See Edson*, 63 Cal. App. 4th at 1274-75.  Accordingly, because Plaintiff's Complaint fails to state a viable Eighth Amendment claim, *see supra* Part IV.B.2, the Court concludes that Plaintiff has likewise failed to allege a state law battery claim against Defendants.  Therefore, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's battery claim should be **GRANTED**.

### 3.    Intentional and Negligent Infliction of Emotional Distress

"In order to establish a claim for intentional infliction of emotional distress under California law, [a plaintiff is] required to show (1) that the defendant's conduct was outrageous, (2) that the defendant intended to cause or recklessly disregarded the probability of causing emotional distress, and (3) that the plaintiff's severe emotional suffering was (4) actually and proximately caused by defendant's conduct."  *Austin*, 367 F.3d at 1172 (citing *Brooks v. United States*, 29 F. Supp. 2d 613, 617 (N.D. Cal. 1998)).  Conduct is outrageous if it is so extreme as to exceed all bounds of that usually tolerated in a civilized society.  *Corales v. Bennett*, 567 F.3d 554, 571 (9th Cir. 2009); *Tekle v. United States*, 511 F.3d 839, 855 (9th Cir. 2007); *Simo v. Union of Needletrades, Indus. & Textile Emps.*, 322 F.3d 602, 622 (9th Cir. 2003).

"A cause of action for negligent infliction of emotional distress requires that a plaintiff show '(1) serious emotional distress, (2) actually and proximately caused by

(3) wrongful conduct (4) by a defendant who should have foreseen that the conduct would cause such distress.'" *Austin*, 367 F.3d at 1172 (quoting *Brooks*, 29 F. Supp. 2d at 618).

Defendants contend Plaintiff fails to state a claim for intentional or negligent infliction of emotional distress because his Complaint does not allege that he suffered any physical injury as required by 42 U.S.C. § 1997e(e).  (ECF No. 18-1 at 5:11-13, 22-24.)  Section 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18, United States Code)." 42 U.S.C. § 1997e(e).  Plaintiff does not allege physical injury.  Moreover, although he does allege a touching that is sexual in nature, Plaintiff's allegations regarding the touching do not fall into any of the definitions of "sexual act" set forth in 18 U.S.C. § 2246(2).

Accordingly, Plaintiff has failed to state a claim for intentional or negligent infliction of emotional distress.  The Court therefore **RECOMMENDS** that Defendants' Motion to Dismiss these claims should be **GRANTED**.

**D.     Failure to Prosecute**

Plaintiff has failed to prosecute his claims against Defendants County of San Diego and Sheriff Gore.  Specifically, the summons was issued on August 28, 2014. (ECF No. 4.)   Plaintiff had previously been granted leave to proceed *in forma pauperis*, and the Court directed the U.S. Marshal to effectuate service on Plaintiff's behalf.  (ECF No. 3.)  However, there is no indication on the docket that Plaintiff ever completed the U.S. Marshal Form 285 as to Defendant County of San Diego.  Further, although Plaintiff provided the U.S. Marshal with a Form 285 as to Sheriff Gore, the form was returned unexecuted because Plaintiff provided an incorrect address for Sheriff Gore.  (ECF No. 15.)  The docket does not reflect that Plaintiff has attempted to correct this deficiency.  As a result of the foregoing, Defendants County of San

44

Diego and Sheriff Gore have not been served with the summons and Complaint. As more than 120 days have elapsed since the issuance of the summons, the Court **RECOMMENDS** that Plaintiff be ordered to show cause why Defendants County of San Diego and Sheriff Gore should not be dismissed for failure to prosecute pursuant to Federal Rule of Civil Procedure 4(m).[16]

**E.    Leave to Amend**

Defendants contend, without citing any law or providing any analysis, that their Motion to Dismiss should be granted without leave to amend. (*See* ECF No. 18-1 at 9:12-13.) The Court disagrees.

A court order which grants a motion to dismiss a complaint must be accompanied by leave to amend unless amendment would be futile. *Lopez*, 203 F.3d at 1127; *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 983 (9th Cir. 2000); *Cahill*, 80 F.3d at 339 (where amendment of litigant's complaint would be futile, denial of leave to amend is appropriate). In other words, denial of leave to amend is generally not appropriate unless the Court has determined "that the pleadings could not possibly be cured by the allegation of other facts." *Lopez*, 203 F.3d at 1127; *see also Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) ("A district court does not err in denying leave to amend where the amendment would be futile.").

Here, Plaintiff should be permitted leave to amend his Complaint to seek more than moot injunctive relief and to plead additional facts to cure the defects analyzed above. Accordingly, the Court **RECOMMENDS** Plaintiff should be given leave to amend his Complaint.

/ / /

---

[16]    The claim against Defendant County of San Diego is for municipal liability pursuant to *Monell*, *supra*. (*See* ECF No. 1 at 15.) The claim against Sheriff Gore is for failure to train deputies. (*See id.* at 13.) Based on the status of these two un-served Defendants, the Court declines to address whether Plaintiff's claims against them should survive a motion to dismiss.

# V. CONCLUSION

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.3.   For the reasons outlined above, IT IS HEREBY RECOMMENDED that the District Judge issue an order:

1.   Approving and adopting this Report and Recommendation;

2.   Granting Defendants' Motion to Dismiss with leave to amend; and

3.   Ordering Plaintiff to show cause why Defendants County of San Diego and Sheriff William Gore should not be dismissed for failure to prosecute pursuant to Federal Rule of Civil Procedure 4(m).

IT IS FURTHER ORDERED that no later than **June 10, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties.   The document should be captioned "Objections to Report and Recommendation."   Any reply to the objections shall be filed with the Court and served on all parties no later than **June 22, 2015**.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.   *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: May 13, 2015

_____

DAVID H. BARTICK
United States Magistrate Judge